# In the United States Court of Federal Claims

No. 11-111C
(Filed Under Seal: May 20, 2011)
(Reissued for Publication: June 14, 2011)[*]
TO BE PUBLISHED

| | | |
|---|---|---|
| | ) | |
| DEFENSE TECHNOLOGY, INC., | ) | Jurisdiction over Cancellation of |
| | ) | Solicitation; Standing to Challenge |
| Plaintiff, | ) | Proposed Sole-Source Award; Political |
| | ) | Question; Cancellation of Solicitation; |
| v. | ) | FAR 1.102(b)(3), 1.102-2(c)(3), 3.101-1, |
| | ) | and 15.305(b); Pretext for Canceling |
| THE UNITED STATES, | ) | Solicitation; Judicial Estoppel; Public |
| | ) | Interest Exception to Competition |
| Defendant, | ) | Requirement, 10 U.S.C. § 2304(c) and |
| | ) | FAR 6.302-7; Notice of Intent to Enter |
| and | ) | into Sole-Source Contract, 10 U.S.C. |
| | ) | § 2304(f) and FAR 5.202(a); Exceptions |
| RICHARD J. DOUGLAS, | ) | to Publishing Notice of Intent to Enter |
| | ) | into Sole-Source Contract, 41 U.S.C. |
| Defendant-Intervenor. | ) | § 416(c) (re-codified as § 1708(b)) and |
| | ) | FAR 5.202(a)(10); Language Required for |
| | ) | Synopsis; Implied Contract to Fairly and |
| | ) | Honestly Consider Proposals; Injunctive |
| | ) | Relief; Bid Preparation and Proposal |
| | ) | Costs |

John Jeffery Rich, Sirote & Permutt, P.C., Huntsville, AL, for plaintiff.

David Alan Levitt, Trial Attorney, Kenneth M. Dintzer, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Tony West, Assistant Attorney General, Civil Division, United States Department of Justice, Washington D.C., for defendant.

Richard J. Douglas, College Park, MD, defendant-intervenor, *pro se*.

---

[*] This opinion and order was filed under seal on May 20, 2011 (docket entry 102) to give the parties an opportunity to request redactions of information covered by the amended protective order entered in this action on March 2, 2011 (docket entry 14). The parties were directed to set forth the basis for any redactions sought. Plaintiff requested no redactions. The defendant-intervenor did not have access to information filed under seal. Order (docket entry 45, April 5, 2011). The Government requested redaction of the names of the procurement officials associated with the relevant federal agencies "to protect the personal privacy of Federal officials involved in the procurements" (docket entry 106, June 9, 2011). The Government also sought to

## OPINION AND ORDER

GEORGE W. MILLER, Judge

  Defense Technology, Inc. ("DTI") filed this bid protest challenging (1) the cancellation of a Naval Air Systems Command ("NAVAIR") solicitation for the procurement of 21 Mi-17 helicopters for the Afghan National Army Air Force ("ANAAF") and (2) the subsequent proposed sole-source procurement by the U.S. Army of the same helicopters from a Russian

---

redact material in two footnotes that it contends reveal "confidential source selection information provided by offerors in the NAVAIR procurement."

  In considering whether to redact information from a published opinion, a court should "honor the 'presumption of public access to judicial records.'" *Allied Tech. Group, Inc. v. United States*, 94 Fed. Cl. 16, 23 n.1 (2010) (quoting *Baystate Techs., Inc. v. Bowers*, 283 F. App'x 808, 810 (Fed. Cir. 2008) (citing *Siedle v. Putnam Invs., Inc.*, 147 F.3d 7, 9 (1st Cir. 1998))); *accord Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 131-33 (2010). However, "[i]mportant countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." *Siedle,* 147 F.3d at 10. Therefore, "the court must balance the privacy interests of the parties against the public interest in access to the . . . information." *Baystate Techs.*, 283 F. App'x at 810. Moreover, only "protected information," as defined by the governing protective order, is appropriate for redaction. *See Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 519 n.* (2010) (citing *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 314 n.1 (2009)).

  The Court declines to make the Government's proposed redactions. The protective order in this case defines "protected information" as "information that must be protected to safeguard the competitive process, including source selection information, proprietary information, and confidential information." Am. Prot. Order ¶ 1. First, the names of procurement officials do not constitute "information that must be protected to safeguard the competitive process." Moreover, the Government has little or no legitimate "privacy interest" in this case in withholding the names of public officials, especially those—like the United States Ambassador to Russia— whose names and positions are already a matter of public record. *Cf. Baystate Techs.*, 283 F. App'x at 810.

  The Court also declines to redact the language the Government alleges contains "confidential source selection information provided by offerors in the NAVAIR procurement." While that information was produced under seal in the course of an unsuccessful GAO protest of the NAVAIR solicitation, it is unclear how continuing to conceal that information at this time (well after the NAVAIR solicitation's cancellation and given AMCOM's clear intention to award a sole-source contract) would "safeguard the competitive process," Am. Prot. Order ¶ 1. In any event, the Court is not persuaded that the Government's interest in protecting the information in question—to the extent that the Government has any such interest—is sufficient to overcome the well-established "presumption of public access" to judicial records. *See Allied Tech. Group*, 94 Fed. Cl. at 23 n.1. In view of the foregoing, the Court's opinion and order is released for publication without any redactions.

state-owned enterprise.  DTI seeks injunctive relief as well as bid preparation and proposal costs.
For the reasons set forth below, the Court denies injunctive relief but grants plaintiff's request for
bid preparation and proposal costs, with the amount of such costs to be determined in subsequent
proceedings.

## I.    Background

### A.    Defense Technology, Inc.

Based in Huntsville, Alabama, DTI is a government contractor that supplies the United
States Department of Defense ("DoD") with military and dual-use hardware, much of which DTI
procures from Russia and other members of the Commonwealth of Independent States.
Administrative Record at 198-202 (docket entry 16, Mar. 8, 2011) ("AR").  DTI also has offices
in Russia, Afghanistan, and the United Arab Emirates.  Sec. Am. Compl. ¶ 5.  DTI has
previously secured and performed NAVAIR contracts to provide Mi-17 helicopters, spare parts,
and maintenance services.  AR 201.

### B.    Rosoboronexport

Rosoboronexport, also known as "Russian Defense Export" ("RDE"), is a Russian state-
owned enterprise based in Moscow.  AR 484.  RDE serves as an intermediary for Russia's
military defense-related hardware trade and enjoys the exclusive right to sell Russian military
hardware that requires a military End Use Certificate ("EUC").[1]  AR 483.  According to DTI,
this exclusive right of sale extends only to hardware configured for military use—*i.e.*, equipped
with weapons—or sold directly to a foreign military entity with a military EUC and does not
cover the sale of civil equipment not purchased in a military configuration.  Sec. Am. Compl.
¶ 11.

On August 4, 2006, the U.S. Department of State imposed sanctions on RDE based on
the Department's determination that RDE had provided Iran with materials prohibited under the
Iran Nonproliferation Act of 2000.  71 Fed. Reg. 44345 (Aug. 4, 2006).  The sanctions provided
in part that "[n]o department or agency of the United States Government may procure, or enter
into any contract for the procurement of, any goods, technology, or services from [RDE]."  *Id.*
Based on RDE's having supplied certain covered materials to Syria and Iran, the State
Department imposed similar sanctions on RDE in 2007 and again in 2008.  72 Fed. Reg. 606
(Jan. 5, 2007); 73 Fed. Reg. 63226-27 (Oct. 23, 2008).

---

[1] An EUC is a document used in international transfers, including arms sales and arms
provided as aid, to certify that the buyer or other recipient is the final recipient and is not
planning to transfer the materials to another party.  *See generally* Mark Bromley & Hugh
Griffiths, *End-User Certificates: Improving standards to prevent diversion*, No. 2010/3, Mar.
2010, *available at* http://books.sipri.org/files/insight/SIPRIInsight1003.pdf.

On May 18, 2010, the United States confirmed that Russia had agreed to a draft resolution on the imposition of sanctions on Iran by the United Nations.[2]   *Hearing on the New START Treaty before the S. Foreign Relations Comm.*, 111th Cong (2010) (statement of Hillary R. Clinton, Secretary of State).  Three days later, on May 21, 2010, the sanctions against RDE were terminated.  75 Fed. Reg. 28673-74 (May 21, 2010).  As a result, RDE again became eligible to supply military and other hardware to United States agencies.

> C.      *The NAVAIR Solicitation and Cancellation*

> 1.      The Solicitation

On July 8, 2010, NAVAIR issued Solicitation No. N00019-10-R-0032 ("NAVAIR solicitation").  AR Tab 16.  The solicitation called for 21 new Mi-17 helicopters,[3] along with accessory tools, spare parts, and pre-acceptance testing.  AR 147-48.  The NAVAIR solicitation required the contractor to deliver the Mi-17s to the Combined Airpower Transition Force at Kabul Airport for transfer to the ANAAF.  AR 149-50.  The NAVAIR solicitation required offerors to:

> Demonstrate that the Offeror can deliver Mi-17 variant aircraft in the time frame specified in Section F of this solicitation by providing documentation demonstrating proof of ownership, contingent sale contract, or a contractual relationship that grants the offeror the exclusive right to the aircraft (Provide the serial numbers of each aircraft, if available)

AR 180.

On August 4, 2010, DTI submitted a proposal in response to the NAVAIR solicitation. AR Tab 19.  In preparing its proposal, DTI obtained the permission of what it believed to be the relevant authorities in the Russian Ministry of Defense to export the Mi-17 aircraft from Russia to Afghanistan.  AR 342-44.

> 2.      Initial Notifications Regarding RDE's Involvement in the Export of Military Equipment

During 2010, RDE took the position that it was the sole entity that could export Mi-17s from Russia, but the parties disagree on the exact time at which the Government learned of RDE's position.  At oral argument, plaintiff stated that the administrative record indicates that the Government may have been aware of RDE's position as early as February 2010.  Transcript of May 9, 2011 Hearing at 12 (docket entry 92, May 17, 2011) ("Tr.").  A briefing prepared by Colonel Norbert Vergez, Project Manager of the Army's Non-Standard Rotary Wing Aircraft

---

[2] These actions were part of a broader effort by the President to "reset" relations with the Russian Federation.  *In Russia, Defining the Reset*, White House Blog (July 6, 2009, 2:07 PM), http://www.whitehouse.gov/blog/In-Russia-Defining-the-Reset/.

[3] The Mi-17 helicopter is a medium-weight, single-rotor, five-blade main rotor system helicopter that may be used for various military and civilian purposes.  Sec. Am. Compl. ¶ 7.

Project Office ("NSRWPO"), on August 16, 2010, indicates that an Mi-17 User's Conference took place during July 19-22, 2010.  AR 2239.  Colonel Vergez's briefing further states, "State Department [t]erminated [s]anctions [a]gainst the OEM, clearing the way to establish the business relationship."  AR 2241.  As part of establishing that relationship, representatives of the NSRWPO met with officials of the Russian Government in August 2010 in Moscow.  AR 2241.

At oral argument, the Government quoted from an email from Colonel Vergez in which he stated that he became aware that RDE maintained that it was the sole enterprise that could export Mi-17s from Russia when an official of RDE explained RDE's position at the Farnborough Air Show in England on July 25, 2010.  Def.'s Hearing Ex. 1.  At this time, the NAVAIR solicitation had been publically available for over two weeks.  AR Tab 16.

On August 2, 2010, Colonel Vergez received a letter from Mr. M. Petruhov, an official of RDE, Pl.'s Reply at 13, regarding the acquisition of Mi-17s.  The letter stated that the helicopters were a "product of military type," and therefore RDE was the "sole organization [in Russia] which is allowed to . . . export" the helicopters.  AR 196.

On August 9, 2010, Colonel Vergez received a letter from Mr. Vyacheslav Dzirkali, an official of RDE and Deputy Director of the Russian Federal Service for Military-Technical Cooperation ("FSMTC"), Pl.'s Reply at 13, in which Mr. Dzirkali noted that several companies were attempting to supply "21 Mi-17s for Afghanistan" without having an agreement with RDE.  AR 668.  Mr. Dzirkali's letter stated that the supply of the helicopters will be "forbidden (not possible) in accordance with Russian law."  AR 668.

### 3.   The Moscow Conference

Between August 30 and September 2, 2010, U.S. Army officials met with RDE officials in Moscow regarding military-technical cooperation ("Moscow Conference").[4]  The delegations were headed by the United States Deputy Assistant Secretary of the Army for Defense Exports and Cooperation, Mr. Keith B. Webster, and Mr. Dzirkali.  AR 706.  The working protocol that resulted from the Moscow conference stated that the U.S. Army "understands to a much better degree the crucial aspects that govern the exports of military defense articles from the Russian Federation, specifically that of Mi-17 helicopters."  AR 707.  The meeting notes also indicate that in light of the discussions at the Moscow Conference the Army might need to change the then-current strategy for acquiring the Mi-17 helicopters via the NAVAIR solicitation.[5]  AR 707.

---

[4] A background paper provided to Mr. Al Volkman, Director for International Cooperation in the office of the Undersecretary of Defense for Acquisition, Technology & Logistics ("USD(AT&L)"), stated that the purpose of the meeting "was to explore the feasibility of establishing a direct relationship with [Russian Federal Service for Military-Technical Cooperation], [RDE], and Russian Helicopters [the manufacturer of the helicopters] to support the USG [("U.S. Government")]-funded Mi-17 fleet."  AR 749.

[5] The discussions at the conference were memorialized in a memorandum for the record signed by Mr. Webster on September 16, 2010.  AR 752-53.

Upon returning from the Moscow Conference, Mr. Webster held an Mi-17 Acquisition Teleconference on September 9, 2010 with representatives of NAVAIR and the Army's NSRWPO. AR 729. The notes from the teleconference indicate the participants believed that a distinction existed between the "business of old RDE" during the State Department's ban on doing business with RDE, and the "new business of RDE" after the State Department's sanctions were lifted. AR 730. Mr. Webster reported that officials of the FSMTC had stated that the 21 Mi-17s being purchased by NAVAIR were military products that only RDE could export. AR 730. The notes of the conference state, "Now, we must operate under the rules of 'Business of new'; the Mi-17 is a military end use article." AR 730. The notes also indicate that the use of third-party vendors (referring to entities like DTI) would be prohibited. AR 730.

The September 9 telephonic conference notes state that in light of this information the parties "are now engaging on a new Acquisition Strategy." AR 731. In this respect, NAVAIR "[c]annot bypass Federation [l]aw and proceed with the Navy Acquisition of 21 Mi-17s." AR 731. The participants determined that they would seek guidance from the U.S. Embassy in Moscow. AR 732. At this time, the conference members believed that a letter from the Russian Federation through the U.S. Ambassador would be "required" to confirm the Russian position that RDE was the only entity that could supply the helicopters to ANAAF. AR 732. Mr. Webster also reported that if that was indeed the Russian position, the U.S. military would have to transition procurement responsibility from the Navy to the Army. AR 733.

On September 14, 2010, a background paper prepared for Mr. Volkman reported that the NAVAIR award would be delayed until late November, due at least in part to a pending Government Accountability Office ("GAO") protest challenging the NAVAIR solicitation. AR 749. Having learned of RDE's position at the Moscow Conference, the background paper nonetheless noted that because DoD had previously acquired Mi-17s without the involvement of RDE, RDE's assertion that it was the sole entity entitled to export the Mi-17 helicopters "needs to be validated." AR 750.

An internal informational memorandum dated September 22, 2010 from Mr. Ray VanGorden, an Action Officer with the Office of the Assistant Secretary of the Navy for Air Programs ("DASN (AIR)"), to Mr. Thomas Laux of DASN (AIR), suggested that the Undersecretary of Defense for Policy ("USD(P)") follow up with the appropriate Russian governmental authorities regarding the assertion that RDE was the only entity that could export Mi-17s from Russia. AR 771.

4.     <u>GAO Protest</u>

ARINC, a contractor that had provided helicopters to the Army, filed a protest with the GAO on August 5, 2010, in which it protested the terms of the NAVAIR solicitation on the ground that it was an unjustified *de facto* sole-source solicitation because RDE was the only entity that was permitted by Russian law to export the Mi-17s from Russia. AR 655. In its September 17, 2010 response to the protest, the Government argued in part that RDE was not the sole authorized exporter of Mi-17s. AR 760. The Government based that conclusion to some extent on the fact that DTI had submitted a proposal in response to the NAVAIR solicitation that did not involve RDE. AR 763. However, the Government acknowledged that developments at

the Moscow Conference might impact its ability to award a contract pursuant to the NAVAIR solicitation. AR 764.

In its October 6, 2010 Agency Supplemental Report, the Government maintained its position that RDE was not the only authorized exporter of Mi-17s from Russia. AR 809-10. However, the Government also recognized that "how or whether [RDE] will be able to impact the Russian offices responsible for commercial helicopters or manipulate Russian law is not yet fully known." AR 811. On November 5, 2010, the GAO dismissed ARINC's protest because the GAO found that the protestor had failed to show that the NAVAIR solicitation was a *de facto* sole-source solicitation. AR 862 (ARINC Eng'g Servs., LLC, B-403471.2, 2010 WL 4808460 (Comp. Gen. Nov. 5, 2010)).

### 5.   U.S. Request to Russia for Clarification of the Role of RDE

On September 24, 2010, Mr. Frank Kenlon, Director for International Relations with the USD(AT&L), sent a memorandum to Mr. Volkman and Mr. David Ahern of the Office of the Secretary of Defense ("OSD") regarding an upcoming meeting concerning the Mi-17 procurement. AR 772. The memorandum stated that the Government "is now planning to ask [the Ambassador] to send a [diplomatic] note to the [Ministry of Foreign Affairs] asking for the official [Russian Government] stance on the Navy's purchase plan specifically, and on all potential purchases of military equipment generally." AR 773.

The United States Ambassador to Russia, John R. Beyrle, sent a diplomatic note to Mr. Sergey Alekseyevich, Deputy Minister of Foreign Affairs for the Russian Federation ("MFA") regarding the Mi-17s on October 6, 2010. AR 814. The note requested the official Russian Federation position regarding the NAVAIR effort to acquire 21 Mi-17s for export to Afghanistan for military use. AR 814. The letter acknowledged that RDE exercised authority over the export from Russia of military hardware, but suggested that the Mi-17s might be dual-use items that might be subject to a different set of procedures. AR 814.

In its October 29, 2010 response, the Ministry of Foreign Affairs stated unequivocally that the 21 Mi-17 helicopters were considered to be military items. AR 860. The letter also noted that deliveries of such equipment for the Afghan National Army "can be supported" by RDE. AR 860.

In response to the MFA's October 29 letter, a November 4, 2010 NSRWPO status update reflected that the "Navy concludes that the current solicitation would not be viable for military aircraft." AR 861. A November 10 memorandum from Mr. Ahern to Mr. Frank Kendall of OSD noted that the MFA's October 29 letter stated that the Mi-17s were military, not civilian, items. AR 868. However, the November 10 memorandum also noted that the letter "ambiguously indicates the purchase 'can be supported' by contract with [RDE]." AR 868. The ambiguity regarding whether the purchase can be supported or must be supported by RDE was preventing the Navy from determining whether its solicitation should be canceled. AR 868. Thus, the U.S. Government sought further clarification to resolve the ambiguity. AR 868.

On November 11, Ambassador Beyrle sent a second diplomatic note to the Deputy Foreign Minister seeking clarification of the wording "can be supported" by RDE, specifically,

whether the purchase of Mi-17s "must [be] procure[d] . . . only from [RDE]?"  AR 870.  In his November 25 response, Mr. S. Ryabkov, Deputy Minister of Foreign Affairs, stated that the purchase of the Mi-17s for Afghanistan was "to be effected only through the federal state unitary enterprise [RDE]."  AR 874.

> 6.    Dubai Conference

On November 2, 2010, Colonel Vergez and other representatives of the Army's NSRWPO met with representatives of the Russian FSMTC in Dubai as a follow-up to the Moscow Conference.  Suppl. AR 1 (docket entry 75, Apr. 25, 2011).  The meeting was described as "the second relationship building meeting."  Suppl. AR 1.  The Secretary of Defense and the Prime Minister of Russia were said to be working to support Russian helicopters, specifically to ensure airworthiness and safety.  Suppl. AR 1.

> 7.    Cancellation of the NAVAIR Solicitation

On December 16, 2010, Dr. Ashton Carter, USD(AT&L), issued an Acquisition Determination Memorandum canceling the NAVAIR solicitation and transferring responsibility for the Mi-17 acquisition from NAVAIR to the Army's NSRWPO.  AR 876-77.  Dr. Carter based his decision on the communications from the Russian Foreign Ministry dated October 29, 2010 and November 25, 2010 that stated that under Russian law the Mi-17s sought by the NAVAIR solicitation were military items and could be acquired only through RDE.  AR 877. Based on these letters, Dr. Carter concluded that the Navy's Request for Proposals ("RFP") did not conform to Russian law, and the procurement effort should be transferred to the Army's NSRWPO.  AR 877.

On December 17, 2010, NAVAIR issued an amendment canceling the solicitation for the reasons stated in Dr. Carter's December 16 memorandum.  AR 879-80 ("After learning the position of the Russian Government, the [USD(AT&L)] has removed NAVAIR's authority to continue procuring the Mi-17 aircraft.").

> D.    The AMCOM Solicitation

After procurement authority was transferred to the Army Aviation and Missile Life-Cycle Management Command ("AMCOM"), Secretary of the Army John McHugh issued a Determination and Findings ("D&F") on January 18, 2011, that authorized AMCOM to issue a direct solicitation to RDE in reliance on the public interest exception to the requirement for full and open competition.  AR 1086-90.  AMCOM posted a pre-solicitation notice on the Federal Business Opportunity website ("FedBizOps").  AR 987-88.  It stated, "This is a notice of intent to award a sole-source contract and is not a request for competitive proposals.  [AMCOM] intends to enter into a contract with [RDE]" for the purpose of acquiring 21 Mi-17 helicopters. AR 988.  The notice further stated, "This item is restricted to [RDE]."  AR 988.  However, the notice also stated, "All responsible sources may submit an offer, which shall be considered by the Agency."  AR 988.

On January 21, 2011, DTI President Mark Young emailed Ms. Cynthia Hargrove, the Contracting Officer for the AMCOM solicitation, and asked to attend the Army's pre-proposal meeting with RDE, which was then scheduled for late January in Huntsville, Alabama.  AR

1092-93.  In addition, Mr. Young asked to whom DTI should submit a proposal.  *Id.*  In her January 22, 2011 reply, Ms. Hargrove stated that the meeting with RDE was not open to the public and that a copy of the RFP would be provided to DTI "when it is released."  AR 1092. The pre-proposal meeting was conducted with RDE in Huntsville between January 24 and 27, 2011.  AR 1264.

The AMCOM solicitation was made available to RDE on January 28, 2011, with a response due by February 17, 2011.  AR 1119.  On February 1, 2011, Mr. Young made a second request for the RFP.  AR 1119.  Ms. Ebony Hairston, a Contract Specialist with the U.S. Army Contracting Command, provided Mr. Young with the RFP on February 8, 2011.  AR 1245. After inquiring about obtaining a Statement of Work ("SOW"), AR 1245, Mr. Young received the SOW on February 9, 2011.  AR 1385-86.

On February 10, 2011, DTI requested an extension of 45 days in which to submit its proposal in response to the AMCOM solicitation.  AR 1119.  Plaintiff claims this request was denied, Pl.'s Mot. at 50-51, but the Government states that AMCOM never replied because DTI filed a GAO protest that led to this lawsuit.  AR 1119 (Government's response to DTI's GAO protest of the AMCOM solicitation).  DTI submitted a proposal in response to the AMCOM solicitation on February 16, 2011, AR 1385, in which DTI proposed to provide 21 Mi-17 helicopters from the Ukraine.  AR 1388.

### E.   Procedural History

DTI filed a bid protest with the GAO concerning the cancellation of the NAVAIR solicitation on December 31, 2010.  AR 966 (*Defense Technology Inc.*, B-403471.4).  DTI withdrew that protest on January 20, 2011.  AR 1091.  On February 16, 2011, DTI filed a protest with the GAO concerning the AMCOM solicitation, AR 1102, which the GAO dismissed after DTI filed this action.  AR 1238 (citing 4 C.F.R. § 21.11(b) (2010) ("GAO will dismiss any case where the matter involved is the subject of litigation before, or has been decided on the merits by, a court of competent jurisdiction.")).

DTI filed this action on February 23, 2011.  DTI seeks an injunction requiring defendant to proceed with the NAVAIR solicitation.  DTI also challenges the propriety of AMCOM's proposed sole-source contract with RDE and seeks injunctive relief to require a re-procurement with a new selection authority outside the AMCOM chain of command.  DTI also seeks to recover bid preparation and proposal costs incurred in responding to the AMCOM solicitation. Finally, DTI seeks attorneys' fees, court costs, interest, and expenses.  Plaintiff's motion to file an amended complaint was granted (docket entry 13, Mar. 2, 2011) as was plaintiff's motion to file a second amended complaint (docket entry 30, Mar. 31, 2011).  On March 17, 2011, defendant-intervenor, a former Deputy Assistant Secretary of Defense, Department of Justice Trial Attorney, counselor to two U.S. Senate committees, and the current president of a firm that provides strategic advice on international military trade, moved to intervene *pro se* on the side of the defendant (docket entry 19).  The Court granted that motion on March 17, 2011 (docket entry 20).

Defendant filed a motion to dismiss and/or for judgment on the administrative record (docket entry 21, Mar. 18, 2011) ("Def.'s Mot.").  Plaintiff filed a brief in opposition to

defendant's motion and a cross-motion for judgment on the administrative record (docket entry 35, Apr. 1, 2011) ("Pl.'s Mot."). Defendant then filed a brief in opposition to plaintiff's cross-motion for judgment on the administrative record and a reply in support of its motions (docket entry 50, Apr. 8, 2011) ("Def.'s Reply"). Plaintiff filed a reply brief in support of its cross-motion for judgment on the administrative record (docket entry 68, Apr. 15, 2011) ("Pl.'s Reply"). The Court held a hearing on the parties' motions on May 9, 2011.

## II.    Legal Standards

The Court first considers the legal standards that apply to defendant's motion to dismiss under Rule 12(b)(1)[6] of the Rules of the Court of Federal Claims ("RCFC") and to the parties' motions for judgment on the administrative record.

### A.    Defendant's Rule 12(b)(1) Motion to Dismiss

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9-10 (1983)). When considering a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the Court assumes the truth of all undisputed facts as alleged in the complaint and draws all reasonable inferences in the non-movant's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006). When weighing a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005) (quoting *Scheuer*, 416 U.S. at 236).

"[O]nce the . . . court's subject matter jurisdiction [is] put in question it [is] incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). The plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *George Family Trust ex rel. George v. United States*, 91 Fed. Cl. 177, 189 (2009) (quoting *Reynolds*, 846 F.2d at 748).

### B.    The Parties' Motions for Judgment on the Administrative Record

Pursuant to 28 U.S.C. § 1491(b)(1), the court reviews agency actions in bid protest cases to determine whether they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); *see also* 28 U.S.C. § 1491(b)(4) (incorporating standards of review from the Administrative Procedure Act, 5 U.S.C. § 706). To show that an error occurred, the protestor must establish by a preponderance of the evidence that defendant's actions either lacked a reasonable basis or violated applicable statutes or regulations. *Banknote Corp.*, 365 F.3d at 1351.

---

[6] See *infra*, note 7.

If the reasonable basis for an agency's action is being challenged, the protestor must show that the agency failed to provide a "coherent and reasonable explanation of its exercise of discretion." *Id.* Where the court "finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). There is a "zone of acceptable results in each particular case," and the agency's decision must "be the result of a process that considers the relevant factors and is within the bounds of reasoned decision making." *Info. Scis. Corp. v. United States*, 80 Fed. Cl. 759, 773 (2008) (internal citations and quotation marks omitted). Challenges based on a violation of a regulation or procedure must show a "clear and prejudicial violation of applicable statutes or regulations." *Banknote Corp.*, 365 F.3d at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001)).

If an error occurred, the protestor must then also show that the error was prejudicial. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (quoting *Info. Tech & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). Therefore, "[n]on-prejudicial errors . . . do not automatically invalidate a procurement." *Labatt*, 577 F.3d at 1380.

In reviewing cross-motions for judgment on the administrative record, the Court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot. v. United States*, 72 Fed. Cl. 126, 131 (2006). In a manner "akin to an expedited trial on the paper record," the court will make findings of fact where necessary. *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007) (internal quotation marks omitted).

## III.     Defendant's Motion to Dismiss

In analyzing defendant's motion to dismiss, the Court considers the following issues in turn: jurisdiction over the cancellation of the NAVAIR solicitation; jurisdiction over the AMCOM sole-source solicitation; and justiciability of plaintiff's claims under the political question doctrine.

### A.     *Jurisdiction Over the Cancellation of the NAVAIR Solicitation*

Section 1491(b)(1) confers bid protest jurisdiction on this Court over (1) a solicitation; (2) a proposed award; (3) an award; or (4) an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Regarding the NAVAIR solicitation cancellation, plaintiff's challenge is based on an alleged violation of statute or regulation in connection with a procurement or proposed procurement.

Defendant initially argued that this Court lacks jurisdiction under the Tucker Act, 28 U.S.C. § 1491, claiming that plaintiff had failed to "alleg[e] a violation of any specific statute or regulation." Def.'s Mot. at 20-21 (citing *Info. Scis. Corp. v. United States*, 85 Fed. Cl. 195, 201-

03 (2008) (holding that § 1491(b)(1) jurisdiction requires an allegation of a specific statutory or regulatory provision imposing a duty to act or refrain from acting)).  Plaintiff amended its complaint to cite a number of FAR provisions, including, FAR 1.102(b)(3), 1.102-2(c)(3), and 3.101-1.  Sec. Am. Compl. ¶ 54; *see* Pl.'s Mot. at 39.  Plaintiff again identified the FAR provisions on which it relies at oral argument.  Tr. at 15-16 (citing FAR 1.102-2(c)(1), 1.102-2(c)(3), and 3.101-1).

The Court of Federal Claims recently considered a similar jurisdictional argument in *FFTF Restoration Co., LLC v. United States*, 86 Fed. Cl. 226, 237 (2009).  The court in *FFTF Restoration* characterized the Government's argument as amounting to "an assertion that cancellation decisions in the negotiated procurement context, such as the one at issue in this case, are immune from any sort of judicial review." *Id.* at 237.  In rejecting that argument and finding jurisdiction, the court rebuffed the Government's "attempt to carve out challenges to negotiated procurement cancellations from this court's bid protest jurisdiction." *Id. FFTF Restoration* held that "28 U.S.C. § 1491(b)(1) authorizes this court to review cancellations of negotiated procurements to ensure compliance with the requirements of 'integrity, fairness, and openness' in FAR 1.102(b)(3) and the requirement that '[a]ll contractors and prospective contractors shall be treated fairly and impartially' in FAR 1.102-2(c)(3)." *Id.*  The court further held that "FAR Part 15 does, in fact, provide some constraints, albeit very loose ones, on an agency cancelling a negotiated procurement." *Id.* at 237 n.15.  Specifically, the court held, "in a negotiated procurement, the contracting agency's decision to cancel a solicitation is governed by FAR 15.305(b)." *Id.*  FAR 15.305(b) states: "The source selection authority may reject all proposals received in response to a solicitation, if doing so is in the best interest of the government." *See also DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501, 511 (2008) (finding that FAR 15.305(b) governs an agency's decision to cancel a solicitation).

The Court concludes that Judge Firestone's decision in *FFTF Restoration* is on point and should be followed by this Court.  Defendant's argument would effectively "carve out challenges to . . . procurement cancellations from this court's bid protest jurisdiction," *FFTF Restoration*, 86 Fed. Cl. at 237.  Moreover, FAR 15.305(b) applies to the Government's cancellation of the NAVAIR solicitation in this case.  Therefore, plaintiff's challenge to the cancellation of the NAVAIR solicitation alleges a "violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), and the Court has jurisdiction over plaintiff's claim that cancellation of the NAVAIR solicitation was unlawful.

> B.    *Jurisdiction Over Plaintiff's Challenge to AMCOM's Proposed Sole-Source Award*

Defendant argues that the Court lacks jurisdiction over plaintiff's challenge to the AMCOM sole-source solicitation because plaintiff lacks standing to assert its claim.  This Court has jurisdiction to hear only "cases brought by an 'interested party' objecting to a federal procurement or proposed procurement." *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 529 (2010) (quoting § 1491(b)(1)).  In bid protest cases, a plaintiff seeking to establish standing must demonstrate that it is an "interested party." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  A plaintiff is an interested party if it "'(1) is an actual or prospective bidder and (2) possess[es] the requisite direct economic interest.'" *Id.* at 1359 (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)).  As to the

second prong, to establish standing to protest a sole-source award, "a bidder 'must show that it would have been a qualified bidder.'" *KSD, Inc. v. United States*, 72 Fed. Cl. 236, 246 (2006) (quoting *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370-71 (Fed. Cir. 2002)). "To have standing, the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive." *Myers*, 275 F.3d at 1370 (quoting *Impresa*, 238 F.3d at 1334).

Defendant argues that plaintiff is not a "qualified bidder." Def.'s Mot. at 21 (citing *KSD*, 72 Fed. Cl. at 246). Specifically, defendant argues that plaintiff is not a qualified bidder because Russian law permits only RDE to supply the aircraft in question and that requirement renders any other potential bidder, including DTI, unqualified. Def.'s Mot. at 22. The AMCOM solicitation stated the procurement was "restricted to [RDE]." AR 988. Because plaintiff is not RDE, and will not work with RDE, defendant's argument goes, plaintiff is not a qualified bidder.

Defendant's argument appears to misunderstand plaintiff's position. "To have standing, the plaintiff need only establish that it 'could compete for the contract' *if the bid process were made competitive*." *Myers*, 275 F.3d at 1370 (quoting *Impresa*, 238 F.3d at 1334) (emphasis added). Here, given that the AMCOM solicitation is structured as a sole-source award to RDE, plaintiff cannot compete for the award under the solicitation's current form. But it is precisely this sole-source structure, *i.e.*, the non-competitive nature of the solicitation, that plaintiff challenges as unlawful. Therefore, were plaintiff's substantive challenge to the proposed sole-source award to prevail and "the bid process were made competitive," *Myers*, 275 F.3d at 1370, plaintiff "could compete for the contract," *Impresa*, 238 F.3d at 1334. As a result, plaintiff is a qualified bidder and has standing to protest AMCOM's proposed sole-source award.

### C.    *Justiciability Under the Political Question Doctrine*

While "it is emphatically the province and duty of the judicial department to say what the law is," *El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1361 (Fed. Cir. 2004) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)), "[s]ometimes . . . the law is that the judicial department has no business entertaining [a] claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Id.* (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (citations omitted)). Such questions are so-called "nonjusticiable" or "political questions." *Id.* Referencing the "longstanding doctrine that decisions grounded in defense and foreign policy are responsibilities of the executive branch and . . . not subject to judicial review," defendant argues that the political question doctrine bars this Court from reviewing plaintiff's claims in this case.[7] Def.'s Mot. at 25 (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).

---

[7] Defendant argues that because the issues presented are political questions, the Court should grant its RCFC 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted. Def.'s Mot. at 26. The weight of authority, however, suggests that in rendering an issue nonjusticiable, the political question doctrine deprives a court of subject matter jurisdiction. *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 948 (5th Cir. 2011) ("[W]e view a dismissal on grounds that this case presents a nonjusticiable political question as a Rule 12(b)(1) dismissal for lack of subject matter jurisdiction."); *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260,

While the political question doctrine renders many executive decisions over defense and foreign policy outside the province of the courts, defendant's characterization of the doctrine overstates its scope.  *See Japan Whaling Ass'n*, 478 U.S. at 229-30 ("[I]t is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'" (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962))).  Whether a case presents a nonjusticiable political question requires a more "discriminating inquiry," by analyzing the six factors set forth by the Supreme Court in *Baker v. Carr*.  369 U.S. at 217.  The six factors are:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or
> [2] a lack of judicially discoverable and manageable standards for resolving it; or
> [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or
> [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or
> [5] an unusual need for unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*El-Shifa*, 378 F.3d at 1361 (quoting *Baker*, 369 U.S. at 217) (alterations in original).  "These tests are probably listed in descending order of both importance and certainty."  *Vieth*, 541 U.S. at 278.  But if at least one of the six *Baker* tests "is inextricably present in the facts and circumstances in this case," it presents a nonjusticiable political question.  *El-Shifa*, 378 F.3d at 1362 (citing *Baker*, 369 U.S. at 217).

Here, defendant maintains that all six of the *Baker* factors are present; plaintiff argues that none of them are.  The Court addresses each of the factors in turn.

      1.      <u>A Textually Demonstrable Constitutional Commitment of the Issue to a Coordinate Political Department</u>

The Government argues that the foreign and defense spheres are "textually committed by the Constitution to the political branches."  Def.'s Mot. at 26 (citing *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953); *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948)).  This sweeping characterization is overstated at best.  While there is no question that the Constitution makes the executive and legislative branches primarily responsible for foreign policy matters, *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988), where executive conduct is

---

1262 (D.C. Cir. 2006).  *Contra Zivotofsky v. Sec'y of State*, 571 F.3d 1227, 1236 (D.C. Cir. 2009); *Brown v. Hansen*, 973 F.2d 1118, 1121 (3d Cir. 1992) ("The political question doctrine does not deprive courts of jurisdiction over a case.").  Having reviewed the pertinent authority, the Court concludes that defendant's argument is more properly characterized as supporting a RCFC 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, and the Court will treat defendant's political question arguments as such.

regulated by federal statute or regulation—in any sphere—and the courts are presented with an appropriate controversy, the Constitution requires the courts to take jurisdiction and apply the law. *See Clinton v. Jones*, 520 U.S. 681, 703 (1997) (noting the longstanding rule that "[i]t is emphatically the province and duty of the judicial department to say what the law is" (quoting *Marbury*, 5 U.S. (1 Cranch) at 177)). The Supreme Court has "long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law." *Id.*

This authority and duty extends to the defense, national security, and foreign policy spheres. Indeed, federal courts, including the Supreme Court, routinely review and/or overturn decisions of the executive branch in these fields. *E.g.*, *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) (assuming jurisdiction over petition to enjoin Navy from conducting certain types of submarine training exercises); *Hamdi v. Rumsfeld*, 542 U.S. 507, 535-36 (2004) (partially invalidating Department of Defense's procedure for detaining enemy combatants); *Rasul v. Bush*, 542 U.S. 466, 483 (2004) (holding that federal judiciary has jurisdiction to decide whether foreign nationals captured in combat and held at U.S. military base on foreign soil are being wrongfully detained); *Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 24 (D.C. Cir. 2010) (assuming jurisdiction in challenge to State Department's decisions regarding utilization of foreign embassies). As these and other decisions make plain, merely invoking foreign policy or national defense is insufficient to place an issue beyond judicial review.

Moreover, it is well established that the Administrative Procedure Act, 5 U.S.C. § 706 and the FAR apply to and govern bid protests against Department of Defense procurements, *see, e.g.*, *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1039 (Fed. Cir. 2009) (reviewing bid protestor's challenge to Air Force procurement under the FAR); *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1324 (Fed. Cir. 2003) (reviewing Army solicitation protest), many or all of which touch upon the spheres of national defense and/or foreign policy. Moreover, no court has questioned the constitutionality of judicial oversight of federal defense procurements. For these reasons, defendant's suggestion that the questions of foreign policy and defense raised by this case are textually committed to the executive and/or legislative branches is without merit.

2.     A Lack of Judicially Discoverable and Manageable Standards for Resolving the Issue

The Government's chief argument for its view that the issues in this case are nonjusticiable is that decisions related to foreign policy lack "judicially discoverable and manageable standards for determining the correctness of executive decisions." Def.'s Mot. at 26. Defendant therefore appears to argue that FAR 1.102(b)(3) (requiring "integrity, fairness, and openness" in procurements); FAR 1.102-2(c)(3) (requiring that "[a]ll contractors and prospective contractors shall be treated fairly and impartially"); and FAR 15.305(b) (permitting the source selection authority to "reject all proposals received in response to a solicitation, if doing so is in the best interest of the government") either do not govern this particular procurement or do not provide "judicially discoverable and manageable standards" for resolving plaintiff's claims.

Defendant is wrong on either count. "FAR Part 15 does, in fact, provide some constraints, albeit very loose ones, on an agency cancelling a negotiated procurement. Specifically, in a negotiated procurement, the contracting agency's decision to cancel a

solicitation is governed by FAR 15.305(b) . . . ."  *FFTF Restoration*, 86 Fed. Cl. at 237 n.15. Moreover, FAR 15.305(b) states: "The source selection authority may reject all proposals received in response to a solicitation, if doing so is in the best interest of the government."  *See also DCMS-ISA*, 84 Fed. Cl. at 511 (finding that FAR 15.305(b) governs an agency's decision to cancel a solicitation).  FAR 15.305(b) applies to the Government's solicitation in this case, and it constitutes "judicially discoverable and manageable standards."  Moreover, "the provisions of FAR 1.102(b)(3) and 1.102-2(c) are phrased in mandatory terms," and as such, they "giv[e] rise to mandatory duties that constrain the government's discretion in dealing with bidders."  *FFTF Restoration*, 86 Fed. Cl. at 239; *accord id.* at 240 n.18 (disagreeing with *Information Sciences Corporation*, 85 Fed. Cl. at 202 (holding that FAR 1.102(b)(3) "imposes no specific substantive obligations on the Government, and therefore is not judicially enforceable")).

3.   Impossibility of Resolving the Case Without an Initial Policy
Determination of a Kind Clearly for Nonjudicial Discretion

Defendant suggests that deciding this case would be impossible without an "initial policy determination of a kind clearly for nonjudicial discretion."  *Baker*, 369 U.S. at 217.  The Court finds this argument unpersuasive.  Resolving the issues presented in this case requires only that the Court interpret federal statutes and regulations; it does not require a foreign policy determination.  *Cf. Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235 (3d Cir. 2008).  In *Khouzam*, the Department of Homeland Security determined that, based on diplomatic assurance from the Egyptian government, that an Egyptian Coptic Christian asylum-seeker, Khouzam, would not be tortured were he removed back to Egypt.  *Id.* at 239.  The Government argued that the issue was a nonjusticiable political question because "[t]he United States made a policy determination to approach Egypt to obtain its commitment with respect to Khouzam's treatment."  *Id.* at 252 (quotation omitted).  Rejecting the Government's argument, the court held that "[t]he Government's decision to seek diplomatic assurances is not at issue, but rather whether the Government complied with constitutional, statutory, and regulatory constraints in employing diplomatic assurances to remove Mr. Khouzam."  *Id.*

Similarly, this Court need not make determinations regarding Russian law or policy, diplomacy, or any other issue of foreign policy to resolve this case.  Rather, the Court is asked only to determine whether the Government's decision to cancel the NAVAIR solicitation and seek to enter into a sole-source contract with RDE comported with federal law.  The issue therefore does not implicate the third *Baker* test.  *Cf. Powell v. McCormack*, 395 U.S. 486, 548-49 (1969) (holding that determination of whether congressman-elect should be seated "falls within the traditional role accorded courts to interpret the law, and does not . . . involve an 'initial policy determination of a kind clearly for nonjudicial discretion'" (quoting *Baker*, 369 U.S. at 217)).

4.   Impossibility of a Court's Undertaking to Resolve Plaintiff's Claims
Without Expressing Lack of the Respect Due Coordinate Branches of the
Government

The Government suggests that if a judicial decision were to have the effect of reversing an Executive Branch determination with regard to an acquisition, that decision would necessarily express a lack of respect for the executive's defense and military policy judgment.  Def.'s Mot.

at 26.  Simply interpreting federal law differently from a coordinate branch, however, does not indicate "lack of respect" for that branch, even where that contrary interpretation nullifies the coordinate branch's action.  *Cf. Comer v. Murphy Oil USA*, 585 F.3d 855, 875 (5th Cir. 2009) ("[W]hen a court finds that Congress has passed an unconstitutional law, there is no 'lack of respect' for Congress's judgment.") (citing *United States v. Munoz-Flores*, 495 U.S. 385, 390 (1990)), *rev'd on other grounds*, 607 F.3d 1049 (2010).  Similarly, where a court determines that an executive department has acted unlawfully, that decision does not typically constitute "lack of respect" for the branch's judgment.  Defendant provides no basis for concluding that such a decision would be "disrespectful" to the executive in this case.

5.    An Unusual Need for Unquestioning Adherence to a Political Decision Already Made

The Government further argues that because the decision to cancel the NAVAIR solicitation has already been made, any decision by this Court resuscitating that solicitation would risk alienating the Russian Federation.  Def.'s Mot. at 26.  Defendant cites no authority for its proposition that this risk renders the case nonjusticiable, and the authority of which the Court is aware undermines defendant's argument: "[T]he fact that the resolution of the merits of a case would have 'significant political overtones does not automatically invoke the political question doctrine.'"  *Khouzam*, 549 F.3d at 249-50 (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 942-43 (1983)).  The courts "cannot shirk [the] responsibility" to interpret federal law merely because its decisions "may have significant political overtones."  *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 377 (3d Cir. 2006) (quoting *Japan Whaling*, 478 U.S. at 230).  As a result, "a predicted negative impact on foreign relations does not, by itself, render a case nonjusticiable under the political question doctrine."  *Id.*  Defendant has therefore failed to satisfy the fifth *Baker* factor.

6.    The Potentiality of Embarrassment from Multifarious Pronouncements by Various Departments on One Question

Finally, the Government claims that this Court may not rule on plaintiff's claims because, were the Court to rule for plaintiff, it would "cause embarrassment to the Department of Defense."  Def.'s Mot. at 26.  The Supreme Court addressed an analogous scenario in *Japan Whaling*, 478 U.S. at 229-30.  In that case, after negotiating with Japanese officials, the Secretary of Commerce agreed not to sanction Japan for illegal whale harvesting in return for Japan's agreeing to restrict harvesting in the future.  *Id.* at 227-28.  Environmental groups challenged the Secretary's decision, arguing that federal law required the Secretary to impose sanctions.  *Id.* at 228.  The Supreme Court took jurisdiction over the case, stating that "one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones."  *Id.* at 230; *accord Khouzam*, 549 F.3d at 253 (finding sixth *Baker* factor inapplicable and noting that rationale for finding "makes practical sense since the Executive could otherwise foreclose judicial review in various matters merely by making promises to other nations").  Thus, the possibility of embarrassing an executive agency vis-à-vis a foreign sovereign is an insufficient basis, in and of itself, for nonjusticiability, and the Court finds the sixth *Baker* factor inapplicable here.

Because none of the six *Baker* factors are "inextricably present in the facts and circumstances in this case," *El-Shifa*, 378 F.3d at 1362, the issues in this case present justiciable questions that are appropriate for judicial review.

## IV.    Cross-Motions for Judgment on the Administrative Record

The Court next considers defendant's motion for judgment on the administrative record and plaintiff's cross-motion for judgment on the administrative record. The Court reviews in turn the parties' motions with respect to (A) the cancellation of the NAVAIR solicitation; (B) judicial estoppel; and (C) the AMCOM sole-source solicitation.

      A.     *The Government Did Not Act Arbitrarily When It Canceled the NAVAIR Solicitation and Proposed to Enter into a Sole-Source Contract with RDE Because It Reasonably Relied on the Russian Federation's Interpretation of Russian Law.*

Plaintiff argues that the Government improperly canceled the NAVAIR solicitation on two grounds: (1) DoD improperly relied on the wrong Russian agencies to interpret Russian export law, and basing a decision on an incorrect interpretation of Russian law was arbitrary and capricious; (2) the explanations given for the cancellation were solely a pretext to transfer the procurement to the Army for the purpose of awarding the contract to RDE. Plaintiff contends that these actions violated the Government's duty to "[c]onduct business with integrity, fairness, and openness," FAR 1.102(b)(3), to treat all potential contractors fairly and impartially, FAR 1.102-2(c)(3), to conduct Government business in a manner above reproach, FAR 3.101-1, and to cancel solicitations when it is in the best interest of the Government, FAR 15.305(b). Sec. Am. Compl. ¶ 54; *see also FFTF*, 86 Fed. Cl. at 237 n.15 (finding that FAR 15.305(b) applies to the Government's decision to cancel a solicitation).

Defendant counters that DoD properly sought and relied on authoritative interpretations of Russian law and based on those interpretations canceled the NAVAIR solicitation because it did not require RDE's involvement, which the Russian Foreign Ministry had made clear was required under Russian law. The Court concludes that DoD did not violate FAR 1.102(b)(3), 1.102-2(c)(3), 3.101-1, or 15.305(b) because it did not act arbitrarily or capriciously when it canceled the solicitation based on explanations set forth in the exchange of diplomatic notes between the Russian Foreign Minister and the U.S. Ambassador to Russia. The cancellation was not a mere pretext to improperly award a contract to RDE.

      1.     <u>The Government Reasonably Relied on the Russian Federation's Interpretation of Russian Law in Making Its Decision to Cancel the NAVAIR Solicitation.</u>

The administrative record demonstrates that the Government acted reasonably in (1) investigating the concern that RDE was the only entity authorized under Russian law to export Mi-17s, (2) working with its Russian counterparts to authoritatively determine the applicable Russian law, and (3) ultimately canceling the NAVAIR solicitation based on communications with the Russian government explaining the nature and effect of Russia's export law.

Colonel Vergez learned at least by early August 2010 that Russia classified Mi-17s as military items and as such they could only be exported from Russia by RDE.  AR 196.  The Russian position on the export of Mi-17s was further reiterated at the Moscow Conference at the end of August 2010.  AR 730.  Subsequently, the Government began trying to determine definitively whether Russian law classified Mi-17s as military items, which could only be exported through RDE, and what impact that classification might have on the NAVAIR solicitation.  AR 750, 773.  Ultimately, the Government's inquiry led to an exchange of diplomatic notes between U.S. Ambassador to Russia, John Beyrle, and the Russian Ministry of Foreign Affairs.  AR 814, 860, 870, 874.  Based on the Russian Federation's position in the diplomatic notes that Mi-17s were military items that could be exported only through RDE, Dr. Carter therefore directed that the NAVAIR solicitation be canceled and that procurement responsibility be transferred to the Army.  AR 877, 879-80.

>    a.    The Government reasonably relied on the exchange of diplomatic notes in making its decision to cancel the NAVAIR solicitation.

Plaintiff first takes issue with defendant's interpretation of the Ambassador's October 6 letter, which ultimately led to the cancellation of the NAVAIR solicitation.  Plaintiff claims that the October 29 Russian response said only that the export of Mi-17s "can be supported" by RDE.  Pl.'s Mot. at 41.  Plaintiff contends that the initial exchange of letters contains no information with respect to whether Mi-17s may be exported for civilian purposes, nor do the letters take a position regarding the legality of the export of Mi-17s without involvement by RDE.  Pl.'s Mot. at 41-42 (citing AR 1756).  Plaintiff concludes that it was irrational for the Government to cancel the NAVAIR solicitation based on the Ambassador's October 6 letter and the Russian October 29 response because those documents do not support the conclusion that the Government could not acquire the helicopters for Afghanistan from any source other than RDE.  Pl.'s Mot. at 43.

Plaintiff's argument, however, fails to consider that the Government did not cancel the NAVAIR solicitation based solely on the MFA's October 29, 2010 response.[8]  Indeed, the Government concluded that the MFA's initial letter was ambiguous and sought further clarification.  AR 868.  Because the Government did not cancel the solicitation in response to the

---

[8] Plaintiff cites to a number of records in which the Government contends that DTI may be able to perform pursuant to the NAVAIR solicitation because DTI's proposal appeared to be consistent with Russian law despite RDE's assertion that it is the sole entity for exporting military items.  Pl.'s Mot. at 42 (citing AR 196, 756, 807-08, 1948).  However, these statements were made prior to receiving the Russian MFA's first response regarding the export of Mi-17s.  Indeed, all of these records are dated before the U.S. Ambassador had even sent his first letter, except for one, which is dated the same day the U.S. Ambassador sent his letter.  AR 807-08.  What these records do consistently show is that the Government was uncertain what the state of Russian law was prior to receiving clarification from the Russian MFA.  AR 800 (email from Mr. Dawson dated September 27, 2010, which states, "The Army feels the Navy's successful offeror will not be able to export the aircraft out of Russia; that only [RDE] . . . is authorized to export the Mi-17.")

October 29 letter from the MFA but sought further clarification, plaintiff's contention that the Government canceled the solicitation in response to the October 29 letter is without merit.

Plaintiff next contends that the second exchange of letters between Ambassador Beyrle and the Russian MFA also did not provide justification for the cancellation of the NAVAIR solicitation. Plaintiff argues that the response of the Russian MFA to the Ambassador's request for clarification does not address civilian helicopters. Pl.'s Mot. at 43. Instead, it states only that military helicopters must go through RDE. Pl.'s Mot. at 43. Plaintiff contends that it was offering only civilian helicopters, so the MFA's response was not applicable to the proposal DTI submitted in response to the NAVAIR solicitation. Pl.'s Mot. at 44-45.

The MFA's November 25 letter does not support plaintiff's contention. It states that the 21 Mi-17 military transport helicopters must be purchased only through RDE. AR 874. Although this response mentions only military helicopters, it must be considered in the context of the previous exchange between the Ambassador and the MFA. In the Ambassador's first letter dated October 6, he asked specifically about the NAVAIR's "effort to acquire 21 new Mi-17 *commercial-variant* helicopters for export to Afghanistan for military use." AR 814 (emphasis added). Furthermore, the letter clearly identifies the issue to be clarified, namely whether the Mi-17s that NAVAIR was planning to purchase were considered dual-use and therefore not subject to the requirement to obtain FSMTC licenses for military items being exported by RDE. AR 814. The MFA's October 29 response was clear: "Under Russian law, the 21 Mi-17 helicopters that the [DoD] is planning to purchase are considered military items." AR 860. The MFA's November 25 letter also made clear that purchases of military items are "to be effected only through . . . [RDE]." AR 874.

The exchange of diplomatic notes shows that the U.S. sought clarification from Russia on whether the Mi-17s described in the NAVAIR solicitation were considered under Russian law to be military or commercial items and the proper procedure for exporting such helicopters. The Russian response was clear that the Mi-17s being procured by NAVAIR were military items, and pursuant to Russian law, could be exported only through RDE. To accept plaintiff's contention that the MFA's November 25 response applied only to military Mi-17s and not to the variant Mi-17s described in the NAVAIR solicitation, the Court would have to ignore the exchanges between the U.S. and Russian governments. Therefore, the Court concludes that the Government did not act arbitrarily or capriciously in relying on the exchange of letters between Ambassador Beyrle and the MFA in deciding to cancel the NAVAIR solicitation.

        b.      The Government reasonably determined that Mi-17s were not considered commercial items under Russian law.

Plaintiff also contends that NAVAIR initially determined that RDE did not need to be involved because only civilian helicopters were at issue. Pl.'s Mot. at 44-45. Plaintiff cites NAVAIR's position before the GAO in response to protests of the NAVAIR solicitation. In that forum, NAVAIR argued that RDE was not required to participate because the helicopters at issue were civilian rather than military. Pl.'s Mot. at 44-45 (citing AR 812-13). However, NAVAIR also told GAO that the then-current state of Russian law was ambiguous. AR 764-65. In addition, NAVAIR identified the ambiguity *prior to* Ambassador Beyrle's first letter seeking clarification from Russia regarding the export of Mi-17s. AR 760. The administrative record

demonstrates that the Government sought clarification and that this clarification led to additional information that supported a different conclusion, namely that pursuant to Russian law the Mi-17s were military helicopters that were required to be exported solely through RDE. Therefore, the Government did not act unreasonably in changing its position in this forum with respect to whether the Mi-17s were commercial items and whether RDE needed to be involved with the export of the Mi-17s. The Government's change of position was a response to clarifying information from the Russian Government.

> c.   The Government reasonably relied on Russian statements regarding Russia's classification of Mi-17s as military items rather than relying on Russia's prior practice that had involved classifying Mi-17s as civilian items.

Finally, the Government reasonably relied on the 2010 advice of the MFA even though it was inconsistent with prior Russian practice. The Government knew that DTI had previously provided four Mi-17 helicopters to Afghanistan from Russia without the involvement of RDE. AR 763 n.4 (recognizing before the GAO that the Russian Ministry of Defense, Directorate of Export Deliveries of Arms and Military Technology, had previously provided an export license for four Mi-17 helicopters provided by DTI to Afghanistan). Indeed, the Ministry of Defense had already issued preliminary export licenses to DTI that were included in DTI's response to the NAVAIR solicitation. During the September 9, 2010 telephonic conference regarding the recent Moscow Conference, the Government noted that Russia's different stance with regard to the export of military items coincided with RDE's having been released from State Department sanctions. AR 730. The revocation of sanctions gave the U.S. Government reason to believe that Russia would no longer follow its practice under the sanctions regime relating to the export of Mi-17s.

Furthermore, the Government did not accept the statements of the Russian negotiators without further investigation. The Government ultimately sought clarification through the exchange of diplomatic notes, at which point it confirmed that Russia's position was that the Mi-17s were military items that could be exported only through RDE. AR 860, 874. It was only after receiving clarification from the MFA that the NAVAIR solicitation was canceled. AR 877. When the Government was alerted to the fact that the Russian position on the export of Mi-17s had apparently changed, it was eminently reasonable for the Government to seek clarification, and, having done so, to cancel the NAVAIR solicitation based on authoritative information from officials of the Russian Federation.

> 2.   The Government's Stated Reasons for Canceling the NAVAIR Solicitation Were Not Pretextual.

Plaintiff contends that the Government's stated reasons for canceling the NAVAIR solicitation were a pretext for the Government's actual motive, which DTI contends was to improperly award a sole-source contract for the 21 helicopters to RDE. Pl.'s Mot. at 48. Specifically, plaintiff contends that AMCOM, Colonel Vergez, and David Pinckley, Chief of Operations with NSRWPO, "actively lobbied to get the NAVAIR [s]olicitation canceled so they could pursue a sole-source contract with [RDE]." Pl.'s Mot. at 47. Defendant, however, contends that there was no campaign to get the NAVAIR solicitation canceled, but rather, that

the Department of Defense was reasonably concerned that Russia would refuse to permit the export of Mi-17s without the involvement of RDE.  Def.'s Reply at 18.

An agency's explanation for canceling a solicitation cannot be a pretext for an improper motive or reason, including those "reflecting personal predilections of administrative officials, whether ascribable to whim, misplaced zeal, or impermissible influence."  *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994).  However, there is a "strong presumption that government contract officials exercise their duties in good faith."  *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002).  To overcome this strong presumption, plaintiff must meet a heavy burden and must show "almost irrefragable" proof that the government officials were not operating in good faith.[9]  *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

Plaintiff argues at length that Colonel Vergez and AMCOM improperly interfered with the NAVAIR solicitation in an attempt to ensure that it was canceled and that RDE received any eventual contract.[10]  On August 3, 2010, in response to an email notifying AMCOM personnel about the GAO protest of the NAVAIR solicitation, Colonel Vergez stated,

> We've been wargaming this for some time.  Yes, [Combined Security Transition Command-Afghanistan ("CSTC-A")] can pull the funds. . . . And yes, we're already working the [course of action] for Sole Source Only Source [Justification and Approval ("J&A")] using next year's funds.  The sequence of notification to CSTC-A should be:  NAVAIR notifies them of the [p]rotest, NAVAIR provides options (not many), CSTC-A pulls the funds and the Army steps [in with] our Sole Source Option [with] the Russians using next year's funds.

AR 2251.  Plaintiff argues that AMCOM, particularly Colonel Vergez, had been "wargaming" for some time in an attempt to issue a sole-source award to RDE.[11]  Pl.'s Reply at 13.

Plaintiff then states that AMCOM met with Mr. Vladimir Loganchuck, a Canadian-Russian businessperson who also served as a Special Advisor to the Director of the FSMTC, and Mr. Loganchuck stated that FSTMC would block the export of any aircraft that tried to

---

[9] The Federal Circuit has explained that the *Galen* standard "amounts to 'clear and convincing evidence.'"  *Am-Pro Protective Agency*, 281 F.3d at 1239-40.

[10] Plaintiff initially notes that RDE had joined L-3 Communications Integrated Systems Platform Integration Division to submit a proposal responding to the NAVAIR solicitation.  Pl.'s Reply at 13 (citing AR 458).  Plaintiff then contends that L-3 withdrew from the competition because RDE interfered with the joint effort in order to ensure that RDE could secure the contract for itself.  Pl.'s Reply at 13.  The administrative record does not support that contention.  It reflects only that L-3 withdrew from consideration.  AR 666.

[11] Plaintiff also highlights letters that it asserts "mysteriously appear[ed]" dated August 2 and August 9, 2010, from RDE to Colonel Vergez.  Pl.'s Reply at 13.  However, the letters do little more than bolster RDE's claim that it is the sole entity permitted to export Mi-17s from Russia.

circumvent RDE. Pl.'s Reply at 14 (citing AR 2229). Plaintiff contends that Colonel Vergez emailed this information to the Undersecretary of Defense to influence the Undersecretary's decision.[12] Pl.'s Reply at 14. However, the responses of DoD personnel to the meeting with Mr. Loganchuck demonstrate that DoD's driving concern was NAVAIR's ability to successfully supply Mi-17s. AR 2229 (Brigadier General William T. Crosby: "My concern is that if the Navy awards this contract to someone who does not have a legitimate source of supply, the Army is left in an untenable position to try and deliver aircraft that have been purchased but can't be exported.").

After the Moscow Conference, an email concerning the minutes from the conference included a statement by Lieutenant Colonel Willoughby, in the office of Undersecretary of Defense for Policy, recommending that NSRWPO and NAVAIR conduct talks "based on what you learned during the visit." AR 2205. He then stated that he was "[c]oncerned that FSMTC/industry reps want to derail the current deal mostly out of financial self-interest and not our interests." AR 2205. Colonel Vergez responded that he did not agree with Lieutenant Colonel Willoughby's assessment and that he did not agree with leaving the solicitation with NAVAIR. AR 2205. Based on this email, plaintiff argues that because AMCOM and Colonel Vergez were worried that Lieutenant Colonel Willoughby was not "on-board with the plan," AMCOM "drafted propaganda" in the form of an information paper, approved by Colonel Vergez, to improperly influence future decisions regarding the Mi-17 procurement. Pl.'s Reply at 15 (citing AR 2006-13).

However, plaintiff does not cite any information in the "Information Paper on Mi-17 Procurement for Afghanistan" that is embellished, untrue, or indicative of the paper serving as "propaganda." Most of the paper simply reiterates what was discussed during the Moscow Conference. AR 2008-09. The paper notes AMCOM's concern that the current proposals submitted in response to the NAVAIR solicitation were not viable because they did not involve cooperation with RDE, the only entity in Russia that could export military equipment. AR 2011. This was a concern because any helicopters "procured in violation of Russian [l]aw [would] not be approved for [e]xport." AR 2011.

On September 7, Mr. Richard Senkel with NAVAIR sent an email stating that NAVAIR would need to "obtain formal confirmation from the Russian Federation on the acquisition 'lay of the land.'" AR 2432. Colonel Vergez forwarded the email to Mr. Pinckley stating that Mr. Loganchuck should know that the request is coming and that it "is straight forward as it is only looking for confirmation to what they briefed us in Moscow." AR 2432. Plaintiff imputes insidious motives to this email and asserts that Colonel Vergez was attempting to use Mr. Loganchuck to "ensure NAVAIR received the 'right' response from RDE and FSMTC." Pl.'s Reply at 15. However, the evidence does not support plaintiff's contention that the Russian answer was contrived in some manner to support the cancellation of the NAVAIR solicitation. On the contrary, the administrative record demonstrates that the Government actively sought clarification of Russian law from the Russian Federation.

---

[12] Plaintiff does not cite a specific part of the administrative record to support its contention that Colonel Vergez sent this information to the Undersecretary of Defense.

Subsequently, on September 8, Mr. Pinckley sent an email to General Crosby in which he stated,

> The strategy is to convince the Navy not to engage the FSMTC direct[ly] and to leave that to us.  We also do not want them to pull the RFP prematurely as the protest is buying us valuable time.  [Deputy Assistant Secretary of the Army for Defense Exports and Cooperation] will secure formal correspondence from FSMTC stating that direct contract with [RDE] is the only course for [military helicopters].  This provides Navy the out they need, buys us a little time, and gives us basis for the J&A.

AR 2257.  Plaintiff contends that AMCOM then began attempting to get the letter from FSMTC to secure the cancellation of the NAVAIR solicitation.  Pl.'s Reply at 15 (citing AR 2268). Plaintiff would have the Court infer nefarious intentions from this email, but that contention is again not supported by the record.  In the September 8 email, the NAVAIR attorney working on the GAO protest was seeking information and documentation relating to the information discovered during the Moscow Conference.  AR 2269.  In response, Mr. James Brosky with the Office of Deputy Assistant Secretary of the Army for Defense Exports and Cooperation stated that he was "moving out on engagement with FSMTC to get the letter."  AR 2268.  Considering the context of these emails, it appears that the Government was seeking the letter from FSMTC to confirm what the Army had been told at the Moscow Conference, not to improperly interfere with the NAVAIR solicitation as plaintiff contends.

In a September 23 email, Lieutenant Colonel Benitone with USD(P) stated that the "Russian desk players . . . have little confidence in what the Russian's [sic] have told you and they are also unhappy with the letter being drafted."  AR 1996.  Plaintiff contends that this led to an "all out assault by Colonel Vergez" who then re-engaged Mr. Loganchuck to issue a non-legal opinion on Russia law.  Pl.'s Reply at 16 (citing AR 1729-30).  However, Colonel Vergez sought Mr. Loganchuck's advice only in response to a press release issued by DTI, which stated that an agency of the Russian Ministry of Defense was the body responsible for approving Mi-17 exports.  AR 1729.  In response, Mr. Loganchuck again stated that only FSMTC could approve the export.  AR 1730.  In his September 29 email, Colonel Vergez highlighted this conflicting information and stated that "senior leadership needs to be made aware of what is transpiring before we get sideways with the Russian Federation and adversely impact the way we procure/sustain Mi-17s."  AR 1729.

Plaintiff then contends that AMCOM did not share DTI's press release, Mr. Loganchuck's response, or Colonel Vergez's September 29 email with any of the offices that were skeptical of FSMTC's assertion that RDE was the only entity that could export military items from Russia.  Plaintiff asserts that AMCOM was working through back channels in an attempt to get the NAVAIR solicitation canceled.  Pl.'s Reply at 16 (citing AR 2518 ("I'm not sure [sharing the email with OSD] will benefit anything.  [Undersecretary of Defense for Acquisition, Technology, and Logistics for International Cooperation ("USD(AT&L) IC")] will blow it off saying FSMTC isn't the only source.")).[13]  Plaintiff then cites an email by Steve

---

[13] By the time of the September 30 email to which plaintiff cites, Pl.'s Reply at 16, the Deputy Undersecretary of Defense for Acquisition, Technology, and Logistics for International

Austin, Director of Planning and Analysis with the USD(AT&L) IC that states, "There is good reason to avoid sending signals to the Russians that will help derail the pending Navy procurement of 21 Mi-17s."  Pl.'s Reply at 16 (quoting AR 1721-22).

It is unclear how either of these emails supports plaintiff's contention that AMCOM was working back channels and sending signals to the Russians to help doom the NAVAIR solicitation.  Pl.'s Reply at 16.  Specifically, the email from Mr. Austin with USD(AT&L) IC discussed the Ambassador's November 11 letter that was seeking further clarification from MFA concerning the export of Mi-17s from Russia and stated that the Navy procurement should be "given every chance to succeed."  AR 1722.

Plaintiff then argues that after the response to Ambassador Beryle's October 6 letter, "AMCOM knew the position of certain [U.S. Government] officials and needed to change their opinion if it wanted to get the NAVAIR [s]olicitation cancelled."  Pl.'s Reply at 17.  Plaintiff claims that at this point AMCOM again engaged Mr. Loganchuck to ensure that MFA provided an answer to the U.S. Ambassador's diplomatic note that would necessitate the termination of the NAVAIR solicitation.  Pl.'s Reply at 17.  To support this proposition, plaintiff notes that Mr. Loganchuck sent Colonel Vergez an email confirming that the MFA had received the diplomatic note and that a meeting was planned.  Pl.'s Reply at 17.  According to plaintiff, the fact that Mr. Loganchuck knew that the MFA had received the diplomatic note "confirm[s] that he was acting as a puppeteer throughout the process to achieve the desired result of AMCOM and RDE."  Pl.'s Reply at 17.

However, these emails again do not provide an adequate basis for the Court to find, as plaintiff contends, that Mr. Loganchuck was acting as a "puppeteer" to orchestrate the MFA's response in order to ensure that the NAVAIR solicitation was canceled and a sole-source award made to RDE.  The emails only show that Mr. Loganchuck knew MFA had received the diplomatic note.  Plaintiff produced no evidence from which the Court could find either that Mr. Loganchuck improperly interfered with the MFA or that Mr. Loganchuck should not have possessed knowledge of the note's receipt.

Plaintiff then cites an email from Lieutenant Colonel Michael E. Nerstheimer, an Assistant Army Attaché with the U.S. Department of the Army in Moscow.  In the email, he reports to Lisa Moskowitz with USD(P) that pursuant to a conversation with a Deputy Head of a Regional Department for RDE, "[RDE] will work either directly with a DOD entity or with a firm that is registered with DOD and authorized to enter into contracts on DOD's behalf."  AR 1859.  In addition, Lieutenant Colonel Nerstheimer reported that RDE had provided the same information to Colonel Vergez at the November 2 meeting in Dubai and that Colonel Vergez "perhaps . . . could verify" the information.  AR 1859.  Plaintiff contends that Colonel Vergez

---

Cooperation was aware of the potential issues concerning the exportation of Mi-17s out of Russia.  AR 772-73 (Memorandum from Frank Kenlon, Director of International Negotiations for USD(AT&L) IC/IN regarding the plan to have Ambassador Beryle send a diplomatic note to the MFA regarding the Navy's purchase plan).

never verified the information because he wanted everyone to believe that Mi-17s "had to go through RDE, not another broker."  Pl.'s Reply at 18.

This email also does not support plaintiff's contention that Colonel Vergez purposefully withheld information to get the NAVAIR solicitation canceled and replaced with a sole-source award to RDE.  First, no matter what Colonel Vergez did, the Undersecretary for Defense for Policy became aware that RDE might work with a firm entering into contracts for DoD on November 5 when Lieutenant Colonel Nerstheimer emailed the Undersecretary for Defense for Policy informing him of this fact.  AR 1858-59.  Second, the email does not say that Colonel Vergez will or must verify this information; it says only that he "perhaps . . . could verify" the information.  AR 1859.  Just as there is no evidence that Colonel Vergez did verify this information, plaintiff produces no evidence that anyone at DoD tried to verify the information and was unable to do so.  Finally, and most significantly, the decision to cancel the NAVAIR solicitation did not turn on information that plaintiff contends Colonel Vergez withheld from other DoD personnel.  Instead, it was canceled based on the diplomatic exchanges between Ambassador Beyrle and the MFA.  AR 877.

In fact, the Court concludes that there is no substantial evidence that anyone in the Government actively lobbied for or sought a specific response from Russia regarding the procurement of the Mi-17s.  Indeed, the administrative record reflects that Government officials were genuinely uncertain what the Russian position was, AR 800, so they decided to seek clarification through the exchange of diplomatic notes.  AR 773.  Only after the exchange of notes was the decision made to cancel the NAVAIR solicitation.  AR 877.

Plaintiff also argues that the fact that AMCOM took over the procurement of the 21 Mi-17 helicopters after the NAVAIR solicitation was canceled is further proof that AMCOM acted improperly to get the NAVAIR solicitation canceled so that it could sole source the contract to RDE.  Pl.'s Mot. at 47-48.  The administrative record, however, shows that from the beginning, NAVAIR was only provisionally handling the procurement for AMCOM.  In a January 19, 2010 Acquisition Decision Memorandum, Dr. Carter designated the Army to procure Mi-17s.  AR 63.  The Army and NAVAIR then entered into a memorandum of understanding regarding the procurement of 21 Mi-17 helicopters.  AR 76.  The Navy was to continue procuring the Mi-17s in order to avoid placing funding at risk due to a delay in issuing the January 19, 2010 Acquisition Decision Memorandum.  AR 875.  When the NAVAIR solicitation was canceled because NAVAIR's RFP did not conform to Russian law, Dr. Carter returned procurement authority to the Army for the reasons set forth in his January 19, 2010 Acquisition Decision Memorandum.  AR 63, 877.

Although plaintiff relies upon several documents in the administrative record to support its claim that AMCOM and Colonel Vergez were conspiring to improperly get the NAVAIR solicitation canceled and replaced with a sole-source award to RDE, an examination of these documents reveals that they do not support plaintiff's claims and often contradict those claims.  Plaintiff has failed to carry its heavy burden to demonstrate by clear and convincing evidence that government officials acted in bad faith and that the proffered reason for canceling the NAVAIR solicitation was only a pretext for an improper purpose.  *See FFTF Restoration*, 86 Fed. Cl. at 250 (holding that the agency's actions were not a pretext because the record supported the agency's decision to cancel the solicitation); *cf. Parcel 49C*, 31 F.3d at 1151 (upholding the

trial court's finding that the Government's justifications for cancellation were pretextual because of inconsistencies in the agency's position).  The Court finds that the Government did not violate FAR 1.102(b)(3), 1.102-2(c)(3), 3.101-1, or 13.305(b) because it acted reasonably in canceling the NAVAIR solicitation and its stated reasons for doing so were not a pretext for an improper purpose.

B.      *The Government's Arguments in This Case Do Not Contradict Its Arguments Before the GAO, and There Is Therefore No Basis for Invoking Judicial Estoppel.*

In a late-arriving argument, plaintiff claimed for the first time in its reply brief that the Government should be judicially estopped from arguing that DTI's proposal does not comply with Russian law and that RDE is the only entity that can export Mi-17s from Russia.  Pl.'s Reply at 19.  The basis for the requested estoppel is plaintiff's contention that the Government's position in this case directly contradicts the position it took before the GAO in the earlier protest by ARINC.  Pl.'s Reply at 19 (citing ARINC Eng'g Servs., LLC, B-403471.2, 2010 WL 4808460 (Comp. Gen. Nov. 5, 2010)).

ARINC protested the NAVAIR solicitation on the ground that it was a *de facto* sole-source solicitation because RDE was the only entity that could export Mi-17s from Russia.  AR 862 (ARINC Eng'g Servs., LLC, B-403471.2, 2010 WL 4808460 (Comp. Gen. Nov. 5, 2010)).  During the course of the protest, the Government took the position that RDE was not the sole authorized exporter of Mi-17s, the same position that plaintiff takes in this case.  AR 688, 808-09, 812-13.  The Government also took the position that DTI's response to the NAVAIR solicitation, which did not involve RDE, was consistent with Russian law.  AR 762, 764-65, 811-12.  The GAO ultimately dismissed the protest on the ground that the protestor had not established that RDE was the sole authorized exporter of Mi-17s from Russia.  AR 865.

The doctrine of judicial estoppel posits that "where a party assumes a certain position in a legal proceeding, and succeeds . . . he may not thereafter, simply because his interests have changed, assume a contrary position."  *Davis v. Wakelee*, 156 U.S. 680, 689 (1895).  The purpose of the doctrine is to protect the integrity of the judicial process, *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982), and to prevent litigants from "playing fast and loose with the courts."  *Scarano v. Central R.R.*, 203 F.2d 510, 513 (3d Cir. 1953) (internal quotation marks omitted).  Judicial estoppel may apply when a party takes a position before an administrative agency that is later contradicted before a court.  *Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010).

The Government's position before the GAO was based on the facts as the Government understood them at that time, specifically that RDE was not the sole authorized exporter from Russia of Mi-17s.  NAVAIR submitted its legal memorandum to the GAO on September 17, 2010, which was prior to the first letter of clarification that Ambassador Beyrle sent to the Russian MFA on October 6, 2010.  AR 814.  The response from the MFA was dated October 29, 2010, AR 860, and until that point the Government was uncertain about the required involvement of RDE in the sale and export of Mi-17s from Russia.  A party is not judicially estopped from changing positions as a result of changing circumstances or facts.  *New Hampshire v. Maine*, 532 U.S. 742, 755-56 (2001).  The Government's position changed only after it became aware of changes in Russian law and practice—specifically, that under Russian law RDE was the sole

exporter of Mi-17s—and it should not be estopped from espousing a different position as a result of such changes.

Furthermore, the Government made very clear to the GAO that RDE's involvement in the export of Mi-17s might ultimately prove to be necessary. In its initial legal memorandum, the Government indicated that new information could demonstrate that RDE was the sole authorized exporter of Mi-17s from Russia. AR 760 n.1 ("[N]ew revelations raise the possibility that factions within the Russian corporate structure, including [RDE], could take post-award action to thwart DTI's contract performance."); AR 764 ("New revelations of a five-day visit to Moscow by a contingent of Army personnel . . . have arisen. . . . [RDE]'s insistence . . . that the U.S. Government should contract only with it is also irrelevant. . . .The RFP did not either forbid use of [RDE] or require it . . . ."); AR 765 n.10 ("[I]t is premature to consider how the discussions between [RDE] and the U.S. Army should be evaluated by the contracting officer."). In addition, the Government continued to keep the GAO informed of developments concerning RDE in the Agency Supplemental Report. AR 809 ("It must be recognized, however, that [RDE's] declaration of new jurisdiction over all Mi-17s was a development that could not have begun until the [State Department] terminated its sanctions on [RDE] in May of 2010 . . . ."); AR 811 ("[H]ow or whether [RDE] will be able to impact the Russian offices responsible for commercial helicopters or manipulate Russian law is not yet fully known."). The Government's candor with the GAO is not indicative of a party lacking concern for the integrity of the judicial process or attempting to "play fast and loose" with the courts. The Court declines to hold that the Government should be judicially estopped from making the arguments it has made in this case.[14]

> C.     The Government Violated FAR 1.102(b)(3), 1.102-2(c)(3), and 3.101-1 and Did
>        Not Treat DTI Fairly When It Issued a Notice of Intent to Award a Sole-Source
>        Contract to RDE Stating That "All Responsible Sources May Submit an Offer,
>        Which Shall Be Considered," Even Though the Government Did Not Intend to
>        Consider DTI's Proposal.

Plaintiff also contends that the Government violated its duty to conduct business fairly, with integrity, and above reproach when AMCOM encouraged plaintiff to submit a proposal in response to the AMCOM solicitation despite knowing that it would not consider DTI's proposal. Sec. Am. Compl. ¶ 65 (citing FAR 1.102(b)(3), 1.102-2(c)(3), and 3.101-1). Plaintiff also claims the Government's actions violated the implied-in-fact contract to fairly and honestly consider all bids, Sec. Am. Compl. ¶¶ 65-67, but FAR 1.102(b)(3), 1.102-2(c)(3), and 3.101-1 encompass the implied contractual duty to fairly and honestly consider bids. *See FFTF*, 86 Fed. Cl. at 240 (finding that the implied contract to fairly and honestly consider all bids is included within FAR 1.102(b)(3) and 1.102-2(c)(3)). Even if the duty to fairly and honestly consider bids were not

---

[14] A key factor to be considered in deciding whether to invoke judicial estoppel is whether a party's position is "clearly inconsistent with its earlier position." *New Hampshire*, 532 U.S. at 750 (internal quotation marks omitted). In this case, the Government acknowledged to the GAO that the involvement of RDE might impact the Government's ability to award a contract pursuant to the NAVAIR solicitation. AR 809 ("[RDE] . . . had declared the Mi-17 to be 'non-civilian equipment' and therefore solely within [its] jurisdiction. If true, this would make performance under the current NAVAIR RFP impossible.")

encompassed by FAR 1.102(b)(3), 1.102-2(c)(3), and 3.101-1, the cause of action for breach of the implied contract to consider bids fairly and honestly pursuant to 28 U.S.C. § 1491(a) has been held to survive the enactment in 1996 of the Administrative Dispute Resolution Act, § 12(a)(3), and plaintiff has established the elements of such a claim, which provides an alternative basis for finding liability on the facts of this case.  *See L-3 Commc'n Integrated Sys., L.P. v. United States*, 94 Fed. Cl. 394, 398 (2010) (holding that the Federal Circuit's decision in *Resource Conservation Group, LLC v. United States*, 597 F.3d 1238 (Fed. Cir. 2010), did not hold that the court no longer has § 1491(a) jurisdiction over implied contract claims in procurement actions).

Defendant argues that it did not violate the FAR provisions cited above or breach the implied contract to consider all bids fairly and honestly because the AMCOM notice stated that it was not an invitation to submit proposals.  Def.'s Reply at 19.  Defendant also argues that, in any event, DTI was not qualified to submit a proposal because it did not propose to work through RDE.  Def.'s Reply at 20.

### 1.  The Government Gave Notice of Its Intent to Contract with RDE but That Notice Required the Government to Fairly Consider Other Proposals.

Pursuant to 10 U.S.C. § 2304(a)(1)(A), procurements conducted by the Armed Forces must normally be conducted through full and open competition.  However, § 2304(c) provides that non-competitive procedures may be used in certain circumstances.  The public interest exception, 10 U.S.C. § 2304(c)(7); FAR 6.302-7, provides that an agency need not use competitive procedures when the agency head determines that it is in the public interest and notifies Congress of that determination.  On January 18, 2011, the Secretary of the Army issued a D&F on the basis of § 2304(c)(7), AR 1086-90, and notified Congress of this determination on January 24, 2011.  AR 1094-1101.

When the Government uses non-competitive procurement procedures, it must publish a notification alerting the public that it is utilizing such procedures.  10 U.S.C. § 2304(f)(1)(C) (incorporating notification requirements of 41 U.S.C. § 416 (re-codified as 41 U.S.C. § 1708 (Pub. L. No. 111-350, 124 Stat. 3711))).  However, the notification requirements do not apply to procurements conducted pursuant to the public interest exception, 10 U.S.C. § 2304(c)(7).  41 U.S.C. § 416(c)(2) (re-codified as 41 U.S.C. § 1708(b)(2)(A)); 48 C.F.R. § 5.202(a)(10); *see also* Tr. at 48 (Mr. Levitt:  "On the issue of whether AMCOM was required to publish the synopsis, our view is that it was a mistake and it was not required.").  Nonetheless, AMCOM published a notification on the FedBizOps website that stated, "This is a notice of intent to award a sole-source contract and is not a request for competitive proposals.  [AMCOM] intends to enter into a contract with [RDE]" for the purpose of acquiring 21 Mi-17 helicopters.  AR 988.  However, the notice also stated that "[a]ll responsible sources may submit an offer, which shall be considered by the Agency."  AR 988.

The Court is persuaded, as defendant contends, that AMCOM was under no obligation to publish the notification.  Tr. at 48.  *See* 41 U.S.C. § 416(c)(2) (re-codified as 41 U.S.C. § 1708(b)(2)(A)).  But once it did so, AMCOM could not disregard the statements made in the notification.  *See* Businessland, Inc., GSBCA No. 8586-P-R, 86-3 BCA 19288 ("[R]esponses to an initial notice of a potential sole-source award must be duly considered . . . .").  Although

AMCOMS's notice stated that the proposed sole-source contract was restricted to RDE, it also stated that AMCOM would consider other offers submitted by responsible sources.[15]  AR 988. The Government contends that the notice "made plain" that RDE was the only responsible bidder.  Def.'s Reply at 19.  However, to accept the Government's argument would render meaningless the last clause of the notification, which states that offers from responsible sources will be considered.

Furthermore, the notice stated that offers submitted "shall be considered."  The Court concludes that use of the mandatory word "shall" bound the Government to fairly consider offers submitted from responsible sources.  Although the Government argues that DTI was not a responsible source because its proposal did not propose to utilize RDE, that argument presupposes that the notice made clear that only offers to work through RDE would be considered, which is not the case.  In addition, the administrative record does not indicate that the Government ever had any intent to consider a bid by anyone other than RDE.  As the Court found in Part IV.A., the Government's determination that RDE was the sole entity from which the Government could acquire the Mi-17s and export them from Russia was reasonable.  At that point, however, it was no longer reasonable for the Government to issue a notification that advertised that the agency would consider other offers.

2.    The Government's Post-Notification Actions Also Unfairly Encouraged DTI to Respond to the AMCOM Solicitation.

After the sole-source notification was issued on January 13, 2011, DTI asked the Government to whom a proposal should be submitted and requested to attend a late January 2011 pre-proposal meeting in Huntsville to which RDE had been invited.  AR 1092-93.  The Government denied DTI's request to attend the meeting on the basis that it was not open to the public, but it promised to provide DTI with the RFP when it was released.  AR 1092-93.  RDE received the RFP on January 28, 2011.  However, DTI did not receive the RFP until February 8, and only after DTI again asked for the RFP on February 1.[16]  The dilatory action of the Government in providing the RFP was compounded by the fact that proposals were due on February 17 and DTI's requests for an extension were either denied or ignored.

Neither the Government nor the administrative record provides an adequate explanation for the post-notification communications between DTI and AMCOM.  On January 18, 2011, the Secretary of the Army executed a D&F for a sole-source contract with RDE based on the public interest exception, 10 U.S.C. § 2304(c)(7).  DTI's counsel requested a copy of the D&F on January 20, 2011, AR 985, but no copy was ever provided.  Pl.'s Mot. at 52.  DTI contends that

---

[15] Unless the Government is relying on the authority of FAR 6.302-1 to conduct a non-competitive procurement, FAR provides that when notification is required, it should include "a statement that all responsible sources may submit a bid, proposal, or quotation which shall be considered by the agency."  FAR 5.207(15)(i).

[16] Once the notification was published, the Government was required to release the complete solicitation package to any interested business.  41 U.S.C. § 1708(g).

if it had been provided a copy of the D&F, it would have known that AMCOM had no intention of considering DTI's proposal, and thus would not have prepared one.  Pl.'s Mot. at 52.

Additionally, there was no communication between DTI and the Government in which the Government stated unequivocally that it did not intend to consider proposals from anyone other than RDE.  After publishing the notification, the Government did eventually provide DTI with necessary documents to complete a proposal, though they were not provided in an entirely timely manner.  DTI submitted its proposal on February 16, 2011.  AR 1385.  The published notification and the post-notification actions of the Government conveyed the message that AMCOM would consider any proposal submitted by a responsible source.  Regrettably, that message was not accurate.  In view of the foregoing, the Court concludes that the Government violated FAR 1.102(b)(3), 1.102-2(c)(3), and 3.101-1, which required it to treat DTI and its proposal fairly and honestly.  In fact, AMCOM did not intend to consider proposals from anyone but RDE.  It failed to communicate that intent to DTI and then in fact did not consider DTI's proposal. That DTI invested time, money, and energy in the preparation of its proposal was reasonable, and DTI should at least be made whole for these expenditures to the degree permitted by § 1491(b)(2).

## V.    Relief

The Court finds that the Government did not violate any law or regulation and that it acted reasonably when it canceled the NAVAIR solicitation.  However, the Court has concluded that the Government did violate FAR 1.102(b)(3), 1.102-2(c)(3), and 3.101-1 by failing to treat DTI fairly and honestly in connection with the AMCOM solicitation.  The Court has considerable discretion in determining whether to award injunctive relief in a bid protest.  *See* 28 U.S.C. § 1491(b)(2) ("To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) (acknowledging the court's "equitable discretion in deciding whether injunctive relief is appropriate"); *Acad. Facilities Mgmt. v. United States,* 87 Fed. Cl. 441, 472 (2009) ("The decision on whether or not to grant an injunction is within the sound discretion of the trial court.").  In deciding whether to issue a permanent injunction, the Court considers the following factors: (1) whether the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of the hardships to the respective parties favors the grant of injunctive relief; and (4) whether the grant of injunctive relief is in the public interest.  *PGBA*, 389 F.3d at 1227; *Global Computer Enters. v. United States*, 88 Fed. Cl. 350, 403 (2009).  Plaintiff bears a heavy burden of proving that injunctive relief is warranted.  *Dynacs Eng'g Co. v. United States*, 48 Fed. Cl. 614, 616 (2001).

Plaintiff has satisfied the first criterion because the Court has determined that the Government violated FAR 1.102(b)(3), 1.102-2(c)(3), and 3.101-1 by failing to treat DTI fairly, honestly, and in a manner above reproach with respect to DTI's interest in submitting a proposal in response to the AMCOM solicitation.  At oral argument, plaintiff argued that the Court should issue an injunction requiring the Government to conduct a re-procurement and appoint an independent selection authority outside the AMCOM chain of command to evaluate plaintiff's proposal.  Tr. at 82-83.  In order to determine whether to grant such injunctive relief, the Court

must consider the other three factors, namely irreparable harm, balance of hardships, and public interest.

With respect to irreparable harm, plaintiff claims that it expended its capital reserves and took on approximately $900,000 in debt in competing for the NAVAIR solicitation.  Pl.'s Mot. at 45-48.  Because the Court has determined that the NAVAIR solicitation was properly canceled, however, the Court will limit its consideration to irreparable harm allegedly resulting from the Government's conduct in connection with the AMCOM solicitation.

This Court has held repeatedly that denial of an opportunity to compete may itself constitute irreparable injury.  *DGR Assocs., Inc. v. United States*, 94 Fed. Cl. 189, 210-11 (2010) ("A lost opportunity to compete for a contract is sufficient to demonstrate irreparable harm."); *Magnum Opus*, 94 Fed. Cl. at 544 (holding that the loss of the opportunity to compete constitutes irreparable harm).  In this case, not only has DTI effectively been denied an opportunity to compete, but it was also misled about the Government's intentions with respect to its willingness to consider any proposal that DTI might submit.  On the other hand, the D&F issued by the Secretary of the Army makes a compelling case for the conclusion that it is very much in the public interest for AMCOM to enter into a sole-source contract with RDE to acquire the helicopters from RDE for delivery to Afghanistan.  AR 1086-90.  In addition, the prior course of dealing between the U.S. Government and Russia that led to the cancellation of the NAVAIR solicitation made clear that Russia would not look with favor upon AMCOM's entering into a contract with any entity other than RDE to supply the 21 Mi-17 helicopters and to cause them to be exported to Afghanistan.  Accordingly, as a practical matter, the likelihood that DTI might have competed successfully for the contract the Army intends to enter into with RDE seems remote.  Nonetheless, once AMCOM published the notice of intent to award, which contained the language set forth in FAR 5.207(15)(i) that responsible sources may submit proposals and they will be considered by the agency, DTI was entitled to submit a proposal and to have it considered fairly.  The deprivation of that entitlement satisfies DTI's requirement to show irreparable injury.

The public interest and the balance of harms, however, favor defendant.  Defendant has shown that injunctive relief risks damaging the relationship between the U.S. and Russia and threatens the timely withdrawal of U.S. troops from Afghanistan.  Def.'s Mot. at 35.  Plaintiff counters that the defendant's interest in timely acquiring the Mi-17s is not a legitimate basis to withhold injunctive relief because the Government knew when it canceled the NAVAIR solicitation and transferred procurement authority to AMCOM that it would be significantly extending the time needed to acquire the Mi-17s.  Pl.'s Reply at 23.

The Court is statutorily required to give deference to the interests of national security and national defense.  28 U.S.C. § 1491(b)(3) ("In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security . . . ."); *LINC Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 704-05 (2010) (holding that "the public interest in national defense and national security weighs heavily against the grant of a permanent injunction"); *Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 403 (2009) (concluding that the statutory directive to give interest to national defense and national security "militates against granting the [injunctive] relief sought").  Although plaintiff correctly notes that canceling the NAVAIR solicitation and transferring procurement authority to

AMCOM has prolonged the acquisition of the Mi-17s, that does not lessen the Government's interest in acquiring the Mi-17s for use in Afghanistan as soon as possible.  Furthermore, the urgent situation was not created by the Government's own actions because the cancellation of the NAVAIR solicitation occurred only after the Government discovered and confirmed that RDE was the sole entity authorized to supply and export Mi-17s under Russian law.

Plaintiff argues that even if the Government is in urgent need of the helicopters, its proposal to AMCOM would make the helicopters available sooner than under the contract with RDE.  Pl.'s Reply at 24.  This argument is based on plaintiff's assertion that RDE has no helicopters immediately available for export, Pl.'s Reply at 24, which is not supported by the administrative record.

Finally, plaintiff argues that providing Mi-17 helicopters to ANAAF does not impact the military preparedness of the United States.  Pl.'s Reply at 24.  This runs counter to the declaration of Lieutenant General William B. Caldwell, IV, the Commander of the NATO Training Mission-Afghanistan and the Combined Security Transition Command-Afghanistan, in which Lieutenant General Caldwell states,

> [D]elays in fielding these Mi-17s will have a significant impact on US and coalition force structure and rotational plans. . . . Most importantly, the longer it takes to give the [Afghan Air Force] the capability it needs to stand on its own, the more US and coalition lives will be put at risk to make up for that shortfall.

Ex. 1 to Def.'s Reply.  The Court has carefully reviewed each of the parties' submissions regarding relief.  That review has led the Court to conclude that the public interest and balance of harms counsel against awarding plaintiff the injunctive relief it seeks.

In light of the foregoing, the Court concludes that plaintiff has failed to establish that it is entitled to the injunctive relief it seeks for the Government's violation of FAR 1.102(b)(3), 1.102-2(c)(3), and 3.101-1 with respect to the AMCOM solicitation.  But plaintiff is not left without a remedy for this violation because the Court has concluded that plaintiff is entitled to bid preparation and proposal costs incurred in the preparation of its proposal in response to the AMCOM solicitation.  *See EREH Phase I LLC v. United States*, 95 Fed. Cl. 108, 124 (2010) (declining to award injunctive relief on public interest grounds but awarding plaintiff bid preparation and proposal costs); *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 369 (2009) (declining to award injunctive relief and instead awarding bid preparation and proposal costs).

## CONCLUSION

The Court **DENIES** defendant's RCFC 12(b)(1) motion to dismiss.  The Court **GRANTS** defendant's motion for judgment on the administrative record except that the Court **DENIES** defendant's motion as it relates to the AMCOM solicitation, and the Court **DENIES** plaintiff's cross-motion for judgment on the administrative record except that the Court **GRANTS** plaintiff's motion as it relates to the AMCOM solicitation.  The Court **DENIES** plaintiff's request for injunctive relief but **GRANTS** plaintiff's request for costs incurred in the preparation of plaintiff's proposal in response to the AMCOM solicitation.

Given the national security implications of this case and the Court's denial of injunctive relief to plaintiff, the Court determines that there is no just reason for delaying the entry of judgment pursuant to RCFC 54(b) with respect to all claims except plaintiff's claim for bid preparation and proposal costs.  The Clerk is directed to enter judgment accordingly.

With respect to plaintiff's remaining claim for bid preparation and proposal costs, the Court **ORDERS** that the plaintiff submit a detailed, verified statement of its bid preparation and proposal costs to the defendant on or before **Monday, June 20, 2011**.  The parties shall thereafter confer regarding a stipulation of appropriate bid preparation and proposal costs.  Upon reaching agreement, the parties shall file a stipulation with the Court for the entry of judgment for plaintiff in that amount.   In the event that the parties are unable to agree, they shall, on or before **Thursday, July 21, 2011**, file a status report with the Court so stating and setting forth a proposed schedule of further proceedings to resolve the matters still in dispute.

Some information contained herein may be considered protected information subject to the amended protective order entered in this action on March 2, 2011 (docket entry 14).  This Opinion and Order shall therefore be filed under seal.  The parties shall review the Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the protective order prior to publication.  The Court **FURTHER ORDERS** that the parties shall file, by **Thursday, June 9, 2011**, a joint status report identifying the information, if any, they contend should be redacted, together with an explanation of the basis for each proposed redaction.

**IT IS SO ORDERED**

 s/ George W. Miller
GEORGE W. MILLER
Judge